UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DIANA LYNN SANABRIA,

                              Plaintiff,

              -against-

COMMISSIONER OF SOCIAL SECURITY,[1]

                              Defendant.

---

20cv00906 (DF)

**MEMORANDUM
AND ORDER**

**THE HONORABLE DEBRA FREEMAN, U.S.M.J.:**

In this Social Security action, which is before this Court on consent of the parties

pursuant to 28 U.S.C. § 636(c), plaintiff Diana Lynn Sanabria ("Plaintiff") seeks review of the

final decision of defendant Commissioner of Social Security ("Defendant" or the

"Commissioner"), denying Plaintiff Social Security Disability ("SSDI") benefits and

Supplemental Security Income ("SSI") benefits under the Social Security Act (the "Act"), on the

ground that, for the relevant period, Plaintiff's impairments did not render her disabled under the

Act.  Currently before the Court is Plaintiff's motion, pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure, for judgment on the pleadings reversing the Commissioner's decision or, in

the alternative, remanding for further proceedings.  (Dkt. 16.)  Also before the Court is

Defendant's cross-motion, also made pursuant to Rule 12(c), for judgment on the pleadings

affirming the Commissioner's decision.  (Dkt. 18.)  For the reasons set forth below, Plaintiff's

motion (Dkt. 16) is granted to the extent it seeks remand for further administrative proceedings,

and Defendant's cross-motion (Dkt. 18) is denied.

---

[1] As of July 9, 2021, Dr. Kilolo Kijakazi has been appointed Acting Commissioner of the
Social Security Administration ("SSA").

# BACKGROUND[2]

The Court assumes the parties' familiarity with the underlying facts and procedural history of this case, which the Court describes below only as necessary to explain its decision.

On October 6, 2016, Plaintiff filed separate applications for SSI benefits and SSDI benefits, each time alleging a disability onset date of March 17, 2015, as a result of conditions affecting her back, hand/wrist, elbow, neck, shoulder, and knee, as well as fibromyalgia, headaches, and asthma. (R. at 179-88.) After her SSDI application was denied on December 21, 2016, and her SSI application was denied on January 18, 2017 (*see id.* at 90, 101), Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 123-24.) On October 15, 2018, Plaintiff, represented by counsel, testified at a hearing held before ALJ Kieran McCormack (the "Hearing"). (*Id.* at 35-79.) Vocational expert Robert Baker (the "VE") also testified at the Hearing. (*See id.*)

In a decision issued on November 16, 2018, ALJ McCormack found that, although Plaintiff suffered from the severe impairments of fibromyalgia, degenerative disc disease of the lumbosacral spine, cervical disc protrusions, migraine headaches, asthma, and obstructive sleep apnea, her impairments did not meet or equal the criteria of any impairment listed as disabling in the relevant regulations. (*Id.* at 17-18.) The ALJ further found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with certain functional limitations, and, therefore, was not disabled under the Act. (*Id.* at 19.) Plaintiff, represented by counsel, then sought to appeal to the Appeals Council, submitting the reasons why she disagreed with the ALJ's decision. (*Id.* at 175-78.) The Appeals

---

[2] The background facts set forth herein are taken from the SSA Administrative Record (Dkt. 15) (referred to herein as "R." or the "Record").

Council denied Plaintiff's request for review on December 3, 2019, finding that her reasons for seeking review did not provide a basis for changing the ALJ's decision.  (*Id.* at 1-5.)  Thereafter, the ALJ's decision became the final decision of the Commissioner.  Through new counsel, Plaintiff now challenges the Commissioner's denial of benefits before this Court.

### A.    Plaintiff's Personal and Employment History

In her applications for SSDI and SSI benefits, Plaintiff stated that she was born on April 30, 1973, thus making her 41 years old as of her alleged disability onset date of March 17, 2015.  (*Id.* at 207.)  As to her educational background, Plaintiff reported that she completed high school in 2000, but did not attend college or any other specialized job training or a vocational school.  (*Id.*)  Plaintiff reported that she had previously worked as a "PCA" (or Patient Care Assistant) from January 2010 through to March 2015.  (*Id.* at 212.)

According to the form "Disability Report" she completed, Plaintiff stopped working on March 16, 2015 (one day prior to her alleged disability onset date) due to her conditions, which she identified as:  back problems, fibromyalgia, hand/wrist problems, headaches, asthma, an elbow issue, a neck problem, a shoulder problem, and a knee problem.  (*Id.* at 210-11.)  At the time she completed the Disability Report (which was in November 2016), Plaintiff reported that she was taking the following medications:  Naproxen (for inflammation); Tizanidine (for spasms); Topiramate (for headaches); and Tramadol (for pain).

### B.    Medical Evidence

As Plaintiff reported that her disability began on March 17, 2015, the relevant period under review for purposes of her application for SSDI benefits ran from that date until September 30, 2016, the last date that Plaintiff met the "insured status" requirements of the Act.

*See* 42 U.S.C. §§ 423(a)(1), (c)(1); 20 C.F.R. §§ 404.130, 404.315(a); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989).[3]

In contrast, with respect to her application for SSI benefits, the relevant period under review runs from October 6, 2016, the date that Plaintiff applied for those benefits, to November 16, 2018, the date of the ALJ's decision.  *See* 20 C.F.R. §§ 416.330, 416.335; *see Barrie ex rel. F.T. v. Berryhill*, No. 16cv5150 (CS) (JCM), 2017 WL 2560013, at *2 (S.D.N.Y. June 12, 2017) (adopting report and recommendation).[4]

### 1.    Plaintiff's Treatment Records

#### a.    2015

The earliest medical evidence in the Record is from June 7, 2015, when Plaintiff visited the Emergency Department of Catskill Regional Medical Center complaining of right knee pain. (*See* R. at 755-811.)  According to treatment notes, she presented with a steady gait, full range of extremity motion, with no cyanosis or peripheral edema, and mild diffuse tenderness to palpation in her right leg.  (*Id.* at 762.)  A right knee X-ray was negative for fractures.  (*Id.* at 763, 766.)

---

[3] To be eligible for SSDI benefits, "an applicant must be 'insured for disability insurance benefits.'"  *Arnone*, 882 F.2d at 37 (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)).  "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters." *Id.* (citations omitted).  To qualify for SSDI benefits, "Plaintiff's disability onset date must fall prior to [her] date last insured."  *Camacho v. Astrue*, No. 08-CV-6425, 2010 WL 114539, at *2 (W.D.N.Y. Jan. 7, 2010) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)); 20 C.F.R. § 404.315(a).

[4] Generally, "Title II [SSDI] benefits may be paid retroactively for up to 12 months prior to filing of an application.  Payment of Title XVI [SSI] benefits, however, cannot precede the month following the month of application."  *Roman v. Colvin*, No. 13cv7284 (KBF), 2015 WL 4643136, at *1 n.2 (S.D.N.Y. Aug. 4, 2015) (citing 20 C.F.R. §§ 404.621, 416.335); *see also* 20 C.F.R. § 416.501 ("Payment of [SSI] benefits may not be made for any period that *precedes* the first month following the date on which an application is filed . . ." (emphasis added))).

At that time, Dr. Sharona Schneid assessed Plaintiff as having a right knee sprain, and she recommended that Plaintiff wrap the knee at home.  (*See id.*)

One month later, on July 24, 2015, Plaintiff saw pulmonologist Dr. Gary Garfield at the multi-specialty physicians' group, Middletown Medical (*id.* at 593-96), with complaints of fatigue, headaches, stress, tension, and multiple joint and muscle pains including in her Achilles tendons bilaterally (*id.* at 593).  Upon examination, Dr. Garfield found Plaintiff to be comfortable, alert, cooperative, and pleasant, as well as mildly obese.  (*Id.* at 594.)  He assessed her with having fibromyalgia with polyarthralgia,[5] myalgia, asthma, and fatigue due to fibromyalgia and anxiety, and prescribed her Cymbalta for the anxiety.  (*Id.* at 595.)  There were no significant developments at a follow-up visit on September 18, 2015.  (*Id.* at 582-92.)

On October 9, 2015, Plaintiff saw rheumatologist Dr. Mark Bele at Crystal Run Healthcare in Middletown, New York ("Crystal Run").  (*Id.* at 338-40.)  At that time, it was recorded that Plaintiff exhibited swelling and tenderness in her Achilles tendons, with the left more tender than the right; the results of her physical examination were otherwise recorded as normal.  (*Id.* at 339.)  Dr. Bele recommended physical therapy and a left ankle MRI, which was performed that same day.  (*Id.*)  The MRI showed no tears or effusions, chronic Achilles tendinopathy change,[6] and no osseous fracture or infraction.  (*Id.* at 339, 349-50.)

---

[5] Fibromyalgia is caused by "abnormal sensory processing in the central nervous system," and people with fibromyalgia may be "extremely sensitive to pain and other unpleasant sensations."  https://www.arthritis.org/diseases/more-about/fibromyalgia-polymyalgia. Polymyalgia "is an inflammatory disease of the muscle."  *Id.*

[6] Achilles tendinopathy is a condition that causes pain, tenderness, and stiffness of the Achilles tendon, "the band of tissue that connects calf muscles at the back of the lower leg to your heel bone."  https://www.mayoclinic.org/diseases-conditions/achilles-tendinitis/symptoms-causes/syc-20369020.

A few weeks later, on October 23, 2015, Plaintiff had a physical therapy evaluation for Achilles tendonitis.  (*Id.* at 329-31.)  Her rehabilitation potential was assessed as "good," and physical therapy twice a week for four weeks was advised.  (*Id.* at 330-31.)

Also on October 23, 2015, Plaintiff had a consultation with Dr. Anna Sorokin, a neurologist (*id.* at 332-35), to address Plaintiff's complaints of forgetfulness, interrupted sleep from pain, nighttime restlessness, dizziness, mood swings, and tiredness despite a lack of strenuous work at home (*see id.* at 332).  Plaintiff reported that she had tried to exercise, but did not do so on a regular basis due to pain.  (*Id.*)  According to Dr. Sorokin, Plaintiff was in no apparent distress, and was pleasant and cooperative.  (*Id.* at 334.)  Dr. Sorokin wrote that Plaintiff had normal bulk and tone, full (5/5) strength, normal gait, no finger-nose dysmetria,[7] intact sensation to light touch throughout her body, and normal reflexes.  (*Id.*)  Dr. Sorokin assessed that Plaintiff was experiencing memory loss, which Dr. Sorokin suspected was primarily related to impaired sleep, not dementia.  (*Id.*)  A computerized tomography (CT) scan of Plaintiff's head taken that day, the report of which is in the Record, yielded normal results. (*Id.* at 337.)

On November 13, 2015, Plaintiff met with Dr. Konstantin Lipelis, a physiatrist, at Crystal Run (*id.* at 388-93) for complaints of pain in her lower back, knees (right greater than left), and the heels and soles of her feet, with no associated weakness, numbness, or tingling (*see id.* at 388).  Upon examination, Dr. Lipelis recorded that Plaintiff was in no apparent distress; there was no edema or cyanosis in her extremities; and her peripheral pulses were slightly diminished. (*Id.* at 390.)  Neurologically, Dr. Lipelis found that Plaintiff was alert and oriented, and that her

---

[7] The finger-to-nose test "requires you to stretch out your arm and then touch your fingers to your nose" to test for Dysmetria, a "lack of coordination that occurs when the cerebellum [is not] functioning correctly."  https://www.healthline.com/health/dysmetria.

memory was intact.  (*Id.*)  Further, Plaintiff presented as pleasant, with an appropriate mood and affect.  (*Id.*)

With respect to pain, Dr. Lipelis wrote that Plaintiff exhibited pain at the "end range" of flexion, extension, and lateral rotation of her cervical spine, as well as mild tenderness to palpation over the paraspinal muscles, and no tenderness to the paraspinous processes.  (*Id.*)  A Spurling's Test (used to assess nerve root pain) was recorded as negative.  (*Id.*)  As for range of motion and reflexes, Dr. Lipelis assessed that Plaintiff exhibited no pain with range of motion or tenderness to palpation in her lumbar spine; she had taut muscular bands or trigger points[8] palpated in the thoracic or lumbar region; her straight leg and seated slump tests were negative;[9] she displayed normal reflexes, intact sensation, and full muscle strength in the extremities; there was no evidence of atrophy, scars, or knee deformity; and she displayed full range of knee motion, with pain at the end-range.  (*Id.* at 390-91.)  At the same time, Plaintiff had a positive patella grind test,[10] tenderness in the medial aspect of the knees, and tenderness in the Achilles tendon as well as along the gastrocnemius.[11]  (*Id.* at 391.)

---

[8] Trigger points are "sensitive areas of tight muscle fibers [that] can form in your muscles after injuries or overuse."  https://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/symptoms-causes/syc-20375444.  Trigger points "develop in the taut, ropey bands of the muscles."  https://www.healthline.com/health/myofascial-pain.

[9] The straight leg and seated slump tests are used to evaluate lower back pain.  https://www.ncbi.nlm.nih.gov/books/NBK539717/; https://pubmed.ncbi.nlm.nih.gov/18391677/.

[10] The patellar grind test "helps assess the reason for knee pain."  https://my.clevelandclinic.org/health/diagnostics/22428-patellar-grind-test.

[11] The gastrocnemius muscle "is a complex muscle that is fundamental for walking and posture.  It affects the entire lower limb and the movement of the hip and lumbar area."  https://www.ncbi.nlm.nih.gov/books/NBK532946/.

Dr. Lipelis assessed Plaintiff with myofascial pain syndrome, fibromyalgia, Achilles tendonitis, and right knee pain, with distant injury to the right knee and possible right knee derangement.  (*Id.* at 391-92.)  He recommended medication and physical therapy.  (*See id.*)

### b.   <u>2016</u>

On March 14, 2016, Plaintiff met with Physician Assistant ("PA") Dennis Waxman at Middletown Medical.  (*Id.* at 372-74.)  A depression screening conducted that day indicated that Plaintiff was suffering from major depressive disorder, as she had scored a 24 on the PHQ-9 depression screening questionnaire.[12]  (*Id.* at 372.)  Plaintiff reportedly felt that her depression was "related to her fibromyalgia," as she stated to PA Waxman that she had "had no problems with depression prior to developing fibromyalgia."  (*Id.*)

Upon examination, PA Waxman assessed Plaintiff as having normal judgment, insight, and memory, although he characterized her mood and affect as worried and concerned, and her anxiety as "abnormal."  (*See id.* at 373.)  PA Waxman recorded that Plaintiff had a normal gait and normal range of motion, strength, tone, and joint stability in her extremities.  (*Id.*)  PA Waxman assessed Plaintiff with major depressive disorder, fibromyalgia, obesity, and asthma, and recommended continued treatment with medication.  (*See id.* at 373-74.)

Plaintiff had a follow-up appointment with Dr. Lipelis at Crystal Run on April 5, 2016 (*see id.* at 384-87), reporting occasional, minimal nausea from the medication Tramadol (*id.* at 384).  Upon examination, Dr. Lipelis found that Plaintiff was in no apparent distress, had intact memory, and displayed a pleasant and appropriate mood and affect.  (*Id.* at 385-86.)  Dr. Lipelis

---

[12] PHQ-9 is a patient health questionnaire to assess a patient's depression. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/.  PHQ-9 scores of 5, 10, 15, and 20 represent mild, moderate, moderately severe, and severe depression.  *See* http://www.cqaimh.org/pdf/tool_phq9.pdf.

recorded that there were tender points along Plaintiff's cervical and lumbar spine regions, shoulders, and hips, but there was no edema or cyanosis in her extremities and her reflexes were normal. (*Id.* at 386.) Dr. Lipelis advised Plaintiff to exercise for 20 minutes a day. (*Id.* at 387.)

A few weeks later, on April 18, 2016, Plaintiff met again with PA Waxman after she had visited the emergency room due to an exacerbation of her asthma caused by a respiratory infection. (*See id.* at 363-65; *see also id.* 812-78 (emergency room records).) PA Waxman noted that Plaintiff had been treated conservatively in the emergency room with an inhaler that provided relief. (*Id.* at 363.) On April 18, PA Waxman assessed Plaintiff's fibromyalgia and major depressive disorder as "stable." (*Id.*)

Plaintiff saw Dr. Dmitri Gorelov, a neurologist at Crystal Run, on May 20, June 14, and October 19, 2016, with complaints of poor sleep, fatigue, and headaches (*id.* at 319-28), for which Topomax (used to treat migraines) was started as a treatment (*id.* at 328). At the June 14 visit, Plaintiff reported that she was "doing great." (*Id.* at 322.)

Plaintiff returned for a visit with Dr. Lipelis at Crystal Run on July 21, 2016 (*id.* at 379-83), at which time the results of her physical examination were unchanged from her last visit, with the exception that, this time, she had positive straight leg and seated slump tests (*compare id.* at 381, *with id.* at 386).

When Plaintiff next visited PA Waxman on July 25, 2016 (*see id.* at 360-62), she did not report any concerns or complaints, other than that she was experiencing allergies and eczema (*see id.* at 360). The results of her physical examination remained substantially unchanged from the last. (*Id.* at 361.) On that same day, PA Waxman completed a Physical Impairment Questionnaire (*id.* at 399-401), reporting that Plaintiff had been diagnosed with fibromyalgia and asthma, and had a "fair" prognosis (*id.* at 399). PA Waxman also recorded Plaintiff's symptoms

as generalized muscle pain, cramps, complaints of fatigue, and dizziness, and noted that her pain

medication caused dizziness and sedation.  (*Id.*)  He opined that Plaintiff would need to recline or

lie down during an eight-hour workday, in excess of typical breaks.  (*Id.*)  He next opined that

she could walk zero city blocks, sit for 10-to-15 minutes at a time, stand/walk for five-to-10

minutes at a time, sit for two-to-three hours in a workday, and stand/walk for one-to-two hours in

a workday.  (*Id.* at 399-400.)  According to PA Waxman, Plaintiff would need unscheduled

breaks every 10-to-15 minutes, for 10 minutes at a time.  (*Id.* at 399.)  PA Waxman further

opined that Plaintiff could frequently lift less than 10 pounds, occasionally lift 10 pounds, and

never lift more than 20 pounds; she could use her hands to grasp, turn, and twist objects, and her

fingers to perform fine manipulation for 10 percent of an eight-hour workday; and she could use

her arms to reach for five percent of an eight-hour workday.  (*Id.* at 400.)  PA Waxman wrote

that, due to her conditions, Plaintiff would be absent from work more than four days per month,

and she was not capable of working full time, on a sustained basis.  (*Id.*)

A few months later, on October 10, 2016, Plaintiff returned to see PA Waxman, and, at

that time, she complained that she had recently experienced right knee pain that radiated to her

hip, and that this pain had resolved only three days before the appointment.  (*Id.* at 357-59.)

Upon examination, PA Waxman recorded that Plaintiff had a full active range of knee motion

bilaterally, as well as no rashes or suspicious lesions, and that she displayed an "appropriate

affect." (*Id.* at 358.)

Ten days later, on October 20, Plaintiff again saw Dr. Lipelis, and, at that appointment,

Plaintiff denied feeling any numbness, tingling, weakness, depression, or anxiety.  (*Id.* at

375-76.)  According to Dr. Lipelis's notes, the results of Plaintiff's physical examination were

normal, except that she did have pain at the end range of cervical flexion/extension and rotation,

and she did have severe tenderness to palpation over the paraspinal musculature of the cervical spine, left greater than the right.  (*Id.* at 377.)  Dr. Lipelis recommended a trigger-point injection that Plaintiff declined, due to her fear of needles.  (*Id.*)

            **c.**      **2017**

The Record reflects that Plaintiff visited PA Waxman on January 6, February 2, and February 18, 2017, and, during those visits, her physical examinations showed normal results, including normal gait and station, though Plaintiff consistently complained of fatigue and dizziness.  (*Id.* at 548-63.)  Plaintiff also reported having received a psychiatry referral, but she indicated that she would not have the appointment until 2018.  (*Id.* at 552.)

Also, from January through May 2017, Plaintiff saw providers at Crystal Run to treat her chronic pain and fibromyalgia.  (*Id.* at 636-50.)  On January 26, it was recorded that Plaintiff exhibited pain with extension in the lumbar spine, no pain with flexion or lateral bending, and tenderness to palpation, in the lumbar region.  (*Id.* at 649.)  At that time, Plaintiff's straight leg and seated slump tests were negative, and she displayed normal reflexes and full (5/5) muscle strength.  (*Id.* at 649-50.)  Plaintiff's physical examinations on February 7, February 23, and March 1, 2017 were recorded as normal.  (*Id.* at 638, 641-42, 645.)

On March 23, 2017, Plaintiff saw Dr. Koshnaf Antar, a rheumatologist (*see id.* at 536-39), who recorded, upon examination, that Plaintiff was not in acute distress.  According to Dr. Antar, Plaintiff had a history of left eye twitching, and exhibited diffuse tenderness, localized erythema, and ecchymosis in her spine, tender range of motion in her hip, normal motor strength in her extremities, intact reflexes, and normal gait.  (*Id.* at 538-39.)  Dr. Antar recommended that Plaintiff continue with her current medication regime.  (*Id.* at 539.)  Plaintiff's visits with Dr. Antar on May 18 and June 15 yielded substantially similar medical findings, except that

Plaintiff also complained of headaches, fatigue, and lack of energy, at those appointments.  (*Id.* at 515-17, 521-23.)  The results of a brain MRI, conducted on June 6, 2017, at Dr. Antar's request, were also normal.  (*Id.* at 517.)

On May 30, 2017, Plaintiff complained to PA Waxman of having experienced right-side sciatic pain for the prior three days.  (*See id.* at 518-20.)  Upon examination, PA Waxman recorded that Plaintiff had mild sciatic tenderness.  (*Id.* at 519.)  One month later, on June 22, Plaintiff complained of similar pain to Dr. Lipelis, and, upon examination, he found that Plaintiff had tenderness on the bursa of her right hip.  (*Id.* at 629-30.)

On July 20, 2017, Plaintiff complained of eye twitching to Dr. Elena Kaznatcheeva, a neurologist at Middletown Medical, describing this symptom as a "flare under the skin" that suddenly rendered her unable to see out of the affected eye (*id.* at 499), but Plaintiff denied weakness, unstable gait, speech problems, or double vision (*id.*).  Upon examination, Dr. Kaznatcheeva assessed Plaintiff with ocular myokymia,[13] fibromyalgia, and chronic migraines (*id.* at 500); Dr. Kaznatcheeva prescribed Valium[14] for the ocular myokymia, as "stress [was the] main trigger" for the condition (*id.*), but noted that Plaintiff's other conditions were controlled with her existing medications (*see id.*).

During her next visit with Dr. Lipelis on August 23, 2017, Plaintiff complained that she felt "terrible" because she had not been able to fill a prescription for cyclobenzaprine (Flexeril) due to a misunderstanding at the pharmacy.  (*Id.* at 624-27.)  The results of a physical

---

[13] Ocular myokymia is eyelid twitching, which "can range from barely noticeable to bothersome."  https://www.mayoclinic.org/symptoms/eye-twitching/basics/definition/sym-20050838.

[14] Valium is used to treat anxiety, muscle spasm, seizures, and as a sedative. https://www.rxlist.com/valium-drug.htm.

examination were recorded as normal, but for tenderness in multiple joints.  (*Id.* at 626.)
Dr. Lipelis noted that he had increased the dosage of Flexeril.  (*Id.*)

On October 3, 2017, Plaintiff had a follow-up visit with Dr. Kaznatcheeva.  (*Id*. at
482-84.)  Plaintiff reported, at that time, that, although she was still experiencing the symptoms
of myokymia, the episodes had become less frequent, and it seemed that the Valium had helped
her.  (*Id*. at 482-83.)  Plaintiff also reported a burning sensation in her right calf, which was
"quite disturbing" and "constant," and chronic low back pain that radiated to her right leg.  (*Id.* at
482.)  Dr. Kaznatcheeva noted that, for the myokymia, Plaintiff would continue "tak[ing] Valium
for anxiety because stress and anxiety trigger[ed] her symptoms."  (*Id*. at 483.)  For the lumbar
radiculopathy with burning, the doctor ordered an MRI of the spine, and an electromyography
(EMG) and nerve conduction test, stating that she would follow up with Plaintiff after those
tests.  (*Id*.)

The Record then reflects that an MRI of Plaintiff's lumbar spine was conducted on
October 17, 2017, and that it showed multilevel degenerative disc disease and facet joint
changes, as well as disc bulges and protrusions at multiple levels, causing canal stenosis and
neural foraminal narrowing.  (*Id.* at 480-81.)  Apparently, though, Plaintiff did not have the EMG
and nerve conduction study at that time.  (*See id*. at 477.)  At her follow-up visit with
Dr. Kaznatcheeva on December 8, 2017 (which appears to have been her last medical visit of the
year), Plaintiff reported muscle spasms that traveled up her lower back, typically occurring while
sitting, continuing headaches, and new complaints of bilateral "shooting" wrist pain with
numbness and tingling in her hand, especially in her fingers, as well as periodic weakness in her
hands.  (*Id.*)  She also complained of generalized fatigue to point where she would drop things
and need to rest her hands or whole body.  (*Id.*)  Dr. Kazmatcheeva refilled Plaintiff's

prescription for Flexeril for the back spasms and recommended that Plaintiff continue with physical therapy; ordered an EMG for bilateral carpal tunnel syndrome; directed that Plaintiff continue Topamax for her chronic migraines, although she also ordered bloodwork to check Plaintiff's level of that medication; indicated that Plaintiff would also be checked for thyroid function and certain vitamin levels in connection with her generalized fatigue syndrome; and noted that she would follow up with Plaintiff again after an EMG and nerve conduction of her upper extremities.  (*Id.* at 478.)

### d.   <u>2018</u>

Plaintiff proceeded to have the nerve conduction study and EMG of her upper extremities on January 17, 2018, the report of which showed no evidence of neuropathy, myopathy, or radiculopathy.  (*Id.* at 474-76.)

On February 6, 2018, Plaintiff saw PA Samantha Garigliano at Middletown Medical for an annual physical examination.  (*Id.* at 469-73.)  At that visit, Plaintiff reported that her anxiety was controlled by Valium, and that she had not seen a therapist or psychiatrist.  (*Id.* at 469.)  Plaintiff complained of pain in her neck, pain in her lower back that radiated to her right hip and was sometimes "paralyzing," and pain in her right leg and foot.  (*Id.*)  Plaintiff reported that the medication Gabapentin helped significantly with her fibromyalgia pain and that she had not started physical therapy.  (*See id.*)  The results of her physical examination were normal.  (*Id.* at 470-71.)  PA Garigliano recommended continued medication management and an X-ray of Plaintiff's right foot, which, when taken, was normal.  (*Id.* at 471-72; *see also id.* at 458.)  At a return visit on February 27, Plaintiff informed Garigliano that her right foot pain had resolved.  (*Id.* at 454-57.)

On March 12, 2018, Plaintiff went to Excel Physical Therapy (*id.* at 411-13), where she was seen by therapist Joseph Lazaro, who assessed Plaintiff as experiencing pain and decreased range of motion and strength in the paracervical muscles, limiting her ability to carry and handle objects (*id.* at 412). He assessed Plaintiff's rehabilitation potential as good, and he recommended home exercises and physical therapy two-to-three times a week, for six weeks. (*Id.* at 413-14.) Plaintiff attended physical therapy sessions on March 19, 21, and 28, and on April 9, and 11. (*Id.* at 418-30.)

On March 29, 2018, Plaintiff told Dr. Lipelis that her neck and low back pain had worsened after physical therapy. (*Id.* at 615-19.) Upon examination, Dr. Lipelis observed that Plaintiff had a normal gait, normal reflexes, full muscle strength, and no abnormal kyphosis (curvature of the spine) or scoliosis. (*Id.* at 617.) According to Dr. Lipelis, Plaintiff exhibited pain to palpation of her lumbar and thoracic muscles, sacroiliac pain, and greater trochanter pain; but her straight leg test was negative. (*Id.*)

The Record reflects that, on April 10, 2018, Plaintiff had a follow-up appointment with Dr. Antar (*id.* at 444-45). According to Dr. Antar's notes, Plaintiff was in no acute distress and had no edema, clubbing, or cyanosis in her extremities. (*Id.* at 445.) At the same time, though, Dr. Antar found that Plaintiff exhibited diffused tenderness, localized erythema, and ecchymosis in her spine, tenderness with range of motion in her hips, and tenderness in her elbows, wrists, knees and ankles. (*Id.*) Dr. Antar recorded that Plaintiff's elbows, wrists, knees, ankles, and joints of her feet did not exhibit erythema, or synovitis; in addition, Plaintiff exhibited normal motor strength in her extremities, intact reflexes, and normal gait. (*Id.*) Dr. Antar also noted that Plaintiff's cognitive examination was normal. (*Id.*) Dr. Antar recommended pool therapy and medication. (*Id.*)

According to treatment notes in the Record, Plaintiff had a follow-up appointment with PA Garigliano on April 24, 2018 (*id.* at 439-42), at which time she reported two episodes in the prior three months of suddenly feeling nauseous, sweaty, and paralyzed from the waist down, and having shallow breath, which she believed were symptoms caused by her anxiety (*id.* at 439). Plaintiff reported that the results of blood work done in February 2018 were normal, except that they showed a Vitamin D deficiency. (*Id.; see also id.* at 450-53.) PA Garigliano recommended that Plaintiff check her blood sugar and eat regular meals, as her reported episodes occurred after not eating. (*Id.* at 442.) In the notes, PA Garigliano also recorded that Plaintiff was not currently taking Valium for her anxiety. (*Id.*)

Two days later, on April 26, 2018, Plaintiff complained to Dr. Lipelis of pain at a level of 8 out of 10, of chronic generalized anxiety, and of having experienced two episodes of hyperventilation and sudden weakness, which occurred "without provocation." (*Id.* at 611.) Although it does not appear that Dr. Lipelis recorded any significant abnormal findings on his physical examination of Plaintiff, he assessed her with fibromyalgia, low back pain at multiple sites, neck pin, joint pain at multiple sites, and intractable migraine. (*Id.* at 613-14.) As Plaintiff reported dry eyes and difficulty swallowing tablets, Dr. Lipelis recommended that she follow up with a rheumatologist, to rule out Sjogren syndrome,[15] and that she follow up with a mental health specialist for "anxiety and panic disorder." (*Id.* at 613.)

One month later, on May 29, 2018, Plaintiff had another follow-up appointment with Dr. Kaznatcheeva (*id.* 433-34), who recorded that Plaintiff's headaches were then under

---

[15] Sjogren's syndrome "is a disorder of your immune system identified by its two most common symptoms – dry eyes and a dry mouth." https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/symptoms-causes/syc-20353216. "The condition often accompanies other immune system disorders, such as rheumatoid arthritis and lupus." *Id.*

"excellent control" with the medication Topamax (*id.* at 433).  Dr. Kaznatcheeva noted that there

had been some improvement in Plaintiff's pain and muscle spasms, with the use of the

medications Gabapentin and Flexeril, and that Plaintiff's physical examination showed normal

muscle bulk, strength, and tone, as well as intact sensation to light touch and an ability to walk

on toes, heels, and tandem.  (*Id.* at 433-34.)  At that appointment, Plaintiff had described certain

"new symptoms," where she had had "two or three episodes when suddenly she started feeling

cold and sweaty" and, in one instance, "so paralyzed [that] she could not move her arms and

legs."  (*Id.* at 434.)  Dr. Kaznatcheeva recorded that Plaintiff's reported "[p]eriodic paralysis was

"likely [a] vasovagal reaction[16] to the medications."  (*Id.*)

On June 13, 2018, Plaintiff had a consultation with Dr. Stephen Krieg, a psychiatrist at

Crystal Run, based on a referral from Dr. Lipelis.  (*Id.* at 603-10.)  Plaintiff reported to Dr. Krieg

that she was having a panic attack once "every several months" and that she was worried about

having additional panic attacks.  (*Id.* at 603.)  Dr. Krieg wrote that Plaintiff "endorse[d] having

anxiety symptoms related to chronic pain/spinal arthritis issues" and noted that Plaintiff "was

also previously diagnosed with fibromyalgia."  (*Id.*)  At that appointment, Plaintiff denied a

history of agoraphobia or compulsive anxiety symptoms, and also denied "any significant history

of intermittent depressive periods in the past."  (*Id.*)  At the same time, Plaintiff complained of

having insomnia, low energy, and guilty ruminations, as well as having occasional difficulty

controlling her emotions.  (*Id.*)  Plaintiff did not report having any significant difficulty in

concentrating and denied having a loss of interest in activities.  (*Id.*)

---

[16] Vasovagal syncope occurs when you faint because your body overreacts to certain
triggers, such as the sight of blood or extreme emotional distress.
https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-
20350527.

Upon a mental status examination, Dr. Krieg recorded that Plaintiff had good hygiene, was oriented, and had cooperative behavior, as well as a stable, broad, and appropriate affect. (*Id.* at 608.)  Dr. Krieg noted that Plaintiff's recent and remote memory were intact; her speech was normal; her attention and concentration were maintained; her thought process was logical and appropriate; and her insight was good for her current mental state, as was her judgment. (*Id.*)  Dr. Kreig recommended Plaintiff take Sertraline[17] to treat her depressive and anxiety symptoms.  (*Id.* at 609.)  Plaintiff saw Dr. Kreig again one month later, on July 17, 2018, and, at that time, she reported that the medication had not helped significantly.  (*Id.* at 695-99.). According to Dr. Kreig's notes, the results of Plaintiff's mental status examination were normal, except that she displayed an anxious and depressed mood.  (*Id.* at 697.). At that time, Dr. Kreig increased Plaintiff's prescribed dosage of Sertraline.  (*Id.*)

On July 19, 2018, Plaintiff told Dr. Lipelis that her pain was still not controlled, and she complained that her pain was a 9 out of 10.  (*Id.* at 690-94.)  Upon a physical examination, Dr. Lipelis noted that Plaintiff was experiencing trigger points in her neck, shoulder, and lower back.  (*Id.* at 692.)  Dr. Lipelis recommended continued medication.

On July 24, 2018, Dr. Antar submitted a "Physical Assessment," at Plaintiff's request. (*Id.* at 666-68.)  In that document, he opined that Plaintiff's fibromyalgia constantly interfered with the attention and concentration required to perform simple tasks, and that she could only walk zero to three blocks.  (*Id.* at 667.)  He also noted that Plaintiff's medications caused dry mouth and dizziness; that she could sit and stand, respectively, for zero-to-one hour in an eight-

---

[17] "Sertraline is used to treat depression, obsessive-compulsive disorder (OCD), panic disorder, premenstrual dysphoric disorder (PMDD), posttraumatic stress disorder (PTSD), and social anxiety disorder (SAD)."  https://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940.

hour workday; that she would need frequent unscheduled breaks during an eight-hour workday; that she could occasionally lift up to 10 pounds; and that she would be absent from work at least three or four times a month.  (*Id.* at 667-68.)  When asked to opine on Plaintiff's ability to use her hands and fingers, and on how long each of her unscheduled breaks would last before she could return to work, Dr. Antar noted only that Plaintiff had not worked since 2015.  (*Id.* at 667.) He opined that Plaintiff's physical impairments were reasonably consistent with the symptoms and functional limitations in his assessment.  (*Id.* at 668.)

Less than one week later, on July 30, 2018, Plaintiff saw PA Garigliano, at which time Plaintiff reported a recent episode in which she had not been able to use her left (non-dominant) hand for about 10 minutes.  (*Id.* at 671-74.)  Upon a physical examination, PA Garigliano found that Plaintiff had equal sensation and strength in her extremities.  (*Id.* at 672-73.)

The next day, on July 31, 2018, PA Garigliano, like Dr. Antar, submitted a "Physical Assessment," at Plaintiff's request.  (*Id.* at 685-87.)  In it, she listed Plaintiff's diagnoses as fibromyalgia, anxiety, chronic migraines, chronic lower back pain, periodic paralysis, and chronic neck pain.  (*Id.* at 686.)  She opined that Plaintiff's impairments constantly interfered with the attention and concentration required to perform simple tasks; that Plaintiff's medications caused drowsiness; that she could walk zero city blocks due to back pain; that she could sit and stand, respectively, for zero-to-two hours in an eight-hour workday; that she would need unscheduled breaks every one-to-two hours during an eight-hour workday, for about 15 minutes; that she could frequently lift up to 10 pounds; that she could never use her left hands and fingers due to paralysis; that she could use her right hand to grasp, turn, and twist objects, and her fingers for fine manipulation, for about 25 percent of an eight-hour workday; that she could reach with her arms for about 50 percent of an eight-hour workday; and that she would be absent

more than four days a month.  (*Id.* at 686-87.)  PA Garigliano opined that Plaintiff's physical impairments were reasonably consistent with the symptoms and functional limitations in this assessment.  (*Id.* at 687.)

On August 16, 2018, an MRI of Plaintiff's cervical spine was taken, which showed straightening with multilevel degenerative changes, central disc protrusions with mild canal narrowing at C4-C5 through C6-C7, and no cord signal abnormality.  (*Id.* at 936-37.)  An MRI of Plaintiff's brain from that day showed a large polyp/retention cyst in the left maxillary antrum (a paranasal sinus) (*id.* at 938), for which Plaintiff saw Dr. Yvonne Newland Pagan (an Ear, Nose, and Throat Doctor) at Middletown Medical, who recommended its eventual removal (*id.* at 921-23, 929-31).

Lastly, on August 28, 2018, Plaintiff complained of migraine headaches and left-hand weakness to Dr. Kaznatcheeva, who, at that time, prescribed Propranolol to treat the headaches. (*Id.* at 926-28.)  Dr. Kaznatcheeva assessed Plaintiff as having fibromyalgia and chronic migraines, both of which, the doctor indicated, were "controlled," and also assessed her with left-hand weakness with an "unclear etiology," but which, the doctor noted, was "probably related to the stress and fibromyalgia."  (*Id.* at 927.)   Dr. Kaznatcheeva also noted that she had reviewed Plaintiff's MRIs of the cervical spine and brain, and that they showed no significant abnormalities.  (*Id.*)

### 2.   Consultant Reports

#### a.   Internal Medicine Consultative Examiner (Dr. Jay Dinovitser, Internal Medicine Specialist)

On July 10, 2018, Plaintiff met with Dr. Jay Dinovitser, an internal medicine specialist, for a consultative examination.  (*See id.* at 652-57.)   Plaintiff told Dr. Dinovitser that she

cooked, cleaned, washed laundry, and shopped with assistance.  (*Id.* at 654.)  She also reported
that she dressed herself daily, occasionally needing help.  (*Id.*)

On examination, Dr. Dinovitser observed Plaintiff ambulate with a mildly slow gait,
without the need of an assistive device, and noted that she needed no help changing for the
examination or getting on or off the examination table.  (*Id.* at 654-55.)  Dr. Dinovitser recorded
that Plaintiff had a normal stance; was unable to ambulate on her heels or toes; and could squat
to 40 percent, holding onto a table for support.  (*Id.* at 655.)  He also recorded that Plaintiff was
able to rise from her chair without difficulty, but he did find a limitation of lumbar spine flexion
to 60 degrees and of right hip internal rotation to 30 degrees; mild left knee tenderness; trigger
points; three-out-of-five strength in the extremities; and positive straight leg tests.  (*Id.*)

According to Dr. Dinovitser, Plaintiff displayed full range of motion in her cervical spine,
knees, ankles, left hip, shoulders, elbows, forearms, and wrists; there was no muscle atrophy
present in her extremities; she displayed intact hand and finger dexterity and full grip strength;
and she was able to zip, button, and tie without difficulty or discomfort.  (*Id.* at 656.)

With respect to Plaintiff's functional limitations, Dr. Dinovitser opined that Plaintiff had
no limitation using her hands, seeing, hearing, and speaking; that she had mild limitations with
sitting; that she had moderate limitations in pushing, pulling, standing, walking, using stairs and
other climbing; that she had marked limitations in bending, lifting, and carrying; and that she
should avoid exposure to respiratory irritants and prolonged loud noise.  (*Id.* at 657.)  He also
opined that Plaintiff required close access to a restroom and had a moderate limitation in driving.
(*Id.*)

Dr. Dinovitser additionally completed a Medical Source Statement (*id.* at 658-64),
wherein he opined that Plaintiff could lift and carry up to 10 pounds occasionally despite pain in

her cervical spine, lower back, and shoulder (*id.* at 658).  In that Statement, he opined that

Plaintiff could sit for up to one hour at a time and a total of seven hours in an eight-hour

workday.  (*Id.* at 659.)  He further opined that Plaintiff could stand and walk, respectively, for

30 minutes at a time and for three hours, respectively, in an eight-hour workday; that she did not

require a cane to ambulate; that she was limited to frequent (as opposed to continuous) reaching,

but was otherwise unlimited in her in the use of her hands and arms; that she could continuously

use her feet; that she could occasionally climb stairs, ramps, ladders or scaffolds, stoop, kneel,

and crawl; that she could never crouch; and that she could continuously balance.  (*Id.* at 659-61.)

Dr. Dinovitser also found that Plaintiff had some environmental limitations (for instance, related

to respiratory irritants, vibrations, and noise) due to her headaches and asthma (*id.* at 662), but he

found that she had no limitations in performing activities like shopping, walking, and using

public transportation (*id.* at 663).

> **b.** **SSA Records Examiner**
> **(Dr. A. Vinluan, Internal Medicine Specialist)**

The SSA also requested an opinion from Dr. A. Vinluan, an Internal Medicine Specialist,

who, on December 20, 2017, reviewed the then-available evidence.  (*See id.* at 84-86, 96-97.)

Upon reviewing Plaintiff's medical records, Dr. Vinluan noted that Plaintiff was suffering from a

"spine disorder," and that Plaintiff's chief complaint had been pain.  (*Id.* at 84.)  Dr. Vinluan then

opined that, based on the clinical evidence, Plaintiff had the following exertional limitations:  she

could lift and/or carry 20 pounds occasionally; she could lift and/or carry 10 pounds frequently;

she could stand and/or walk (with normal breaks) for a total of six hours in an eight-hour

workday; she could sit (with normal breaks) for a total of six hours in an eight-hour workday;

and she could push and/or pull (including the operation of hand and/or foot controls) in an

unlimited capacity, barring the otherwise-identified weight limitations in lifting and carrying.

(*Id.* at 85.)  Further, with respect to environmental factors, Dr. Vinluan opined that Plaintiff

should avoid concentrated exposure to fumes, odors, gases, and poor ventilation, as well as

hazards such as machinery and heights.  (*Id.* at 86.)

        **C.**      **Plaintiff's Subjective Complaints**

           **1.**      **Plaintiff's Function Report**

In November 2016, Plaintiff completed a form "Function Report" in connection with her

claims for benefits.  (*Id.* at 223-34.)  In that report, Plaintiff wrote that she was experiencing back

pain; mobility issues due to fibromyalgia; vision troubles, drowsiness, and dizziness due to her

medications; memory loss; and stress caused by her pain.  (*Id.* at 223-32.)  She noted that she had

trouble showering for extended periods of time due to pain; that she experienced back pain if she

sat for too long; that she needed help to remember to take her medications; and that she

sometimes needed help to go outside alone due to pain.  (*Id.* at 223-25.)  She indicated that she

was able to clean, do laundry, take care of household chores, pay bills, and sometimes shop in

stores for food and clothing.  (*Id.* at 224-27.)  Nonetheless, she noted that she did not do any

other activities outside, and she did not "have a social life due to pain."  (*Id.* at 227-28.)

As for her specific physical limitations, Plaintiff recorded that:  lifting caused her

"severe" pain; standing for extended periods of time caused her pain; she needed to take many

breaks while walking due to "burning pain"; she could not sit in the same position for long due to

back pain; she struggled to climb stairs due to pain; she could not kneel or squat; she had a

limited reach; her hands cramped; and she had trouble remembering things.  (*Id.* at 227-29.)

While she noted that she did not have problems paying attention, she also indicated that she

could not follow spoken instructions (as opposed to written).  (*Id.* at 229-30.)

As for her medications, Plaintiff noted that they provided relief for "20 [to] 30 minutes," depending on the severity of the pain she felt, but that they had negative side effects, including drowsiness and dizziness.  (*Id.* at 230-31.)  Overall, Plaintiff stated that she felt daily pain throughout her whole body, which had worsened over the years and lasted for "varie[d]" periods of time.  (*Id.* at 231.)

### 2.    Plaintiff's Testimony before the ALJ

As noted above, Plaintiff appeared with counsel and testified at the Hearing.  (*See id.* at 44-72.)  As relevant here, at the start of the Hearing, the ALJ asked Plaintiff's counsel whether "the record [was] complete," and whether counsel was "waiting on any additional evidence related to disability."  (*Id.* at 40.)  Counsel responded by stating that, although the administrative file had previously been "deficient," it was presently "up to date" and there was "no relevant or probative evidence [that was] missing from the file."  (*Id.*)  Plaintiff's counsel then made an opening statement to the ALJ, wherein counsel emphasized that "[t]he impairments alleged [were] both physical and mental health in nature," as Plaintiff claimed to suffer from "pervasive fibromyalgia and polyarthralgia resulting in hand and wrist limitations, neck pain, knee pain, shoulder pain, and elbow pain," as well as "chronic anxiety and major depressive disorder."  (*Id.* at 41.)

After counsel's opening statement, Plaintiff was questioned by the ALJ regarding her past work experience, and she explained that all of her past work had been as a personal care aid.  (*See id.* at 47.)  Turning then to her physical condition, Plaintiff testified that she had back and neck pain, as well as diagnosed fibromyalgia, and that she had needed to stop working in 2015 because "it became too much on [her] body," and that she "was just hurting too much."  (*Id.* at 48, 50.)  Specifically, regarding her fibromyalgia diagnosis, Plaintiff explained that the condition

hurt her feet, legs, arms, shoulders, and back.  (*Id.* at 50.)  She stated that her medications for this condition caused her to "get dizzy a lot" and to experience a significant amount of fatigue.  (*Id.* at 51.)  In addition, Plaintiff testified that she suffered from headaches about "three days a week," which sometimes lasted for a "few hours a day" or could last "all day long."  (*Id.* at 54.)

As for her mental health condition, Plaintiff testified that she had been taking "depression pills" for several months, and that she had been diagnosed with "[s]evere depression."  (*Id.* at 56-57.)  After the ALJ asked her to describe her mental health symptoms, Plaintiff stated:  "I get really depressed due to how I feel."  (*Id.* at 57.)

Lastly, when she was asked to describe some of her daily activities and limitations, Plaintiff testified that it was hard for her to bend or climb stairs; that she sometimes felt "shooting, burning" pain, as well as numbness; that her pain occasionally traveled from her shoulder and elbow; that her pain interfered with her ability to fall asleep; and that she needed to take frequent trips to the bathroom.  (*Id.* at 63-70.)

### 3.    The VE's Testimony Before the ALJ

After Plaintiff concluded her testimony, the VE testified at the Hearing.  (*Id.* at 72.)  As relevant here, the ALJ asked the VE whether there were any jobs in the national economy for a younger individual (*i.e.,* a person younger than 50 years old) who had the following limitations: the person could perform sedentary work; could not crouch; could climb, stoop, kneel, and crawl on an occasional basis; could push and pull on a frequent basis; could not work at jobs containing concentrated exposure to airborne irritants such as fumes, odors, dusts, gases, and/or smoke; could not work at jobs requiring more than frequent exposure to extreme cold, humidity, or wetness; could not work at jobs requiring more than occasional exposure to vibrations; could not work at jobs requiring more than frequent operation of motor vehicles; and could not work at

jobs containing more than occasional exposure to excessive noise, which was defined as noise not found in an office environment.  (*See id.* at 72-74.)

The VE, in response, testified that there were jobs in the national economy for such a person, including the sedentary jobs as an "addresser," a "callout operator," and a "telephone quotation clerk."  (*Id.* at 74-75.)  The VE went on to note, however, that those same jobs would not be available for a person who needed to take "at least three absences from work each month," and, in fact, "no jobs, period," would be available for anyone who required that many absences. (*Id.* at 75.)

### D.        The Current Action and the Motions Before the Court

Represented by counsel, Plaintiff filed a Complaint in this action on February 3, 2020, challenging the Commissioner's decision denying her SSDI and SSI benefits.  (*See* Complaint, dated Feb. 3, 2020 ("Compl.") (Dkt. 1).)  Plaintiff maintained in her Complaint that she was entitled to receive SSDI and SSI benefits because of her impairments, claiming that the ALJ's decision, as affirmed by the Appeals Council, was "not supported by substantial evidence" and was "contrary to law and regulation."  (*Id.* ¶ 10.)

On October 13, 2020, Plaintiff filed a motion for judgment on the pleadings in her favor (Dkt. 16), advancing three arguments:  (1) that the ALJ failed to give adequate consideration to the evidence of Plaintiff's mental health impairment, and, in connection with this, neither adequately developed the Record nor produced a decision that was supported by substantial evidence; (2) that the ALJ erred in his evaluation of the opinion evidence, particularly with respect to evaluating Plaintiff's sit/stand limitations, and that he cherry-picked the opinion evidence to fit the RFC; and (3) that the ALJ failed to conduct an adequate evaluation of

Plaintiff's subjective complaints.  (*See* Plaintiff's Memorandum of Law, dated Oct. 13, 2020 ("Pl. Mem.") (Dkt. 17), at 16-23.)

On December 4, 2020, Defendant filed a cross-motion for judgment on the pleadings affirming the Commissioner's decision.  (Dkt. 18.)  In opposition to Plaintiff's motion and in support of the cross-motion, Defendant contended that the underlying decision of the ALJ was legally correct and supported by substantial evidence.  (*See* Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated Dec. 4, 2020 ("Def. Mem.") (Dkt. 19).)  Specifically, Defendant argued that the ALJ (1) adequately developed the Record and correctly assessed Plaintiff's mental impairments, (2) properly weighed the medical opinion evidence in the Record, and (3) correctly assessed Plaintiff's subjective complaints.  (*See id.*, at 18-25.)

On December 23, 2020, Plaintiff filed a reply memorandum, reiterating her principal contentions that the ALJ committed reversible legal error when he disregarded evidence of Plaintiff's mental health impairment and relatedly failed to secure a treating physician's opinion or consultative examiner's opinion with respect to her mental health; and (2) the ALJ cherry-picked the opinion evidence to conform to the RFC.  (*See* Plaintiff's Reply, dated Dec. 23, 2020 ("Pl. Reply") (Dkt. 20), at 1-3.)

## DISCUSSION

## I.  APPLICABLE LEGAL STANDARDS

### A.  Judgment on the Pleadings

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland, Vt.*,

901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied, and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, the

28

court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.     The Five-Step Sequential Evaluation

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 404.1520(a)(4)(ii), (c); *id.* §§ 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If it does, then the claimant is

presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id*. §§ 404.1520(d), 416.920(d).

Where the claimant alleges a mental impairment, Steps Two and Three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920a, to determine the severity of the claimant's impairment at Step Two, and to determine whether the impairment satisfies Social Security regulations at Step Three.[18]  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment," the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Sections 404.1520a, 416.920a]," which specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.[19]  20 C.F.R. §§ 404.1520a(b), (c)(3); *id.* §§ 416.920a(b), (c)(3); *see Kohler*, 546 F.3d at 265.  The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of

---

[18] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App. 1) used to evaluate claims involving mental disorders under Titles II and XVI of the Act, effective January 17, 2017.  These revisions impacted various relevant portions of 20 C.F.R. §§ 404 and 416; *see Brothers v. Colvin*, No. 7:16cv100 (MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

[19] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

"[n]one," "one or two," "three," or "four or more."  20 C.F.R. §§ 404.1520a(c)(4),

416.920a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ

must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to

perform physical and mental work activities on a sustained basis.  *Id.* §§ 404.1545, 416.945.  The

ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether

the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.*

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her

past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's

RFC, age, education, and work experience, the claimant is capable of performing "any other

work" that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), (g); *id.* §§ 416.920(a)(4)(v),

(g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden

of establishing facts to support her claim.  *See Berry*, 675 F.2d at 467.  At the fifth step, the

burden shifts to the Commissioner to "show that there is work in the national economy that the

claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  The Commissioner

must establish that the alternative work "exists in significant numbers" in the national economy

and that the claimant can perform this work, given his or her RFC and vocational factors.

20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).  Where the claimant only suffers from exertional

impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational

Guidelines (the "Grids"), set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2.

### C.      The ALJ's Duty to Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*,

77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d

751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v.*

*Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *accord Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d

249, 262 (S.D.N.Y. 2016) (noting that "[r]emand is appropriate where this duty is not

discharged").  Indeed, "where there are deficiencies in the record, an ALJ is under an affirmative

obligation to develop a claimant's medical history 'even when the claimant is represented by

counsel.'"  *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).

The SSA regulations explain this duty to claimants in this way:

> Before we make a determination that you are not disabled, we will
> develop your complete medical history . . . [and] will make every
> reasonable effort to help you get medical evidence from your own
> medical sources . . . when you give us permission to request the
> reports. . . .  [']Every reasonable effort['] means that we will make
> an initial request for evidence from your medical source or entity
> that maintains your medical source's evidence, and, at any time
> between 10 and 20 calendar days after the initial request, if the
> evidence has not been received, we will make one follow-up
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. §§ 404.1512(b)(1); 416.912(b)(1).  "[I]f the documents received lack any necessary

information, the ALJ should recontact the treating physician."  *Oliveras ex rel. Gonzalez v.*

*Astrue*, No. 07cv2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report*

*and recommendation adopted*, 2008 WL 2540816 (June 25, 2008).  The ALJ also has the

authority to subpoena medical evidence on behalf of the claimant, 42 U.S.C. § 405(d), but is not

required to subpoena medical records if they are not received following two ordinary requests,

*Gonell De Abreu v. Colvin*, No. 16cv4892 (BMC), 2017 WL 1843103, at *5 (E.D.N.Y. May 2, 2017); *see* 20 C.F.R. §§ 404.950(d); 416.1450(d)(1).

The SSA regulations further explain that a claimant's "complete medical history" means:

> the records of your medical source(s) covering at least the 12 months preceding the month in which you file your application.  If you say that your disability began less than 12 months before you filed your application, we will develop your complete medical history beginning with the month you say your disability began.

20 C.F.R. §§ 404.1512(b)(1)(ii); 416.912(b)(1)(ii)).

If the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations also provide that the ALJ should ask the claimant to attend one or more consultative evaluations. *Id.* §§ 404.1512(b)(2); 416.912(b)(2).  Where, however, there are no "obvious gaps" in the record and where the ALJ already "possesses a 'complete medical history,'" the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5.

The question of "[w]hether the ALJ has met [her] duty to develop the record is a threshold question.  Before reviewing whether the Commissioner's final decision is supported by substantial evidence . . . the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Craig*, 218 F. Supp. 3d at 261-62 (internal quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  Further, the court must satisfy itself that the administrative record has been adequately developed, regardless of whether the issue is raised by the plaintiff.  *See Castillo v. Comm'r of Soc. Sec.*, No. 17cv09953 (JGK) (KHP), 2019 WL 642765, at *7 (S.D.N.Y. Feb. 15, 2019) (noting that, even where the plaintiff does not argue that

an ALJ failed to develop the record, the court "is nevertheless obliged to conduct its own independent assessment of whether the ALJ properly discharged this duty").

### D.      Assessment of a Claimant's Subjective Complaints

Assessment of a claimant's subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-step process.  Where a claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce" the symptoms alleged.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ must take the second step of "evaluat[ing] the intensity and persistence of [the claimant's] symptoms," considering "all of the available evidence," to determine "how [the] symptoms limit [the claimant's] capacity for work."  *Id.* §§ 404.1529(c)(1), 416.929(c)(1).  In doing so, the ALJ must consider all of the available evidence, and must not "reject [ ] statements about the intensity and persistence" of the claimant's symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  *Id.* §§ 404.1529(c)(2), 416.929(c)(2).  Instead, where the claimant's contentions regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's statements in relation to the objective evidence and other evidence, in order to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities.  *Id.* §§ 404.1529(c)(3)-(4); *id.* §§ 416.929(c)(3)-(4); *see also* SSR 16-3p.[20]

_____

[20] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p, which had required the ALJ to make a finding on the credibility of the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms, where those statements are not substantiated by objective medical evidence.  *See* SSR 96-7p (S.S.A. July 2, 1996).  The new ruling, SSR 16-3p, eliminates the use of the term "credibility" from the SSA's sub-

While an ALJ is required to take a claimant's reports of his or her limitations into account in evaluating his or her statements, an ALJ is "not required to accept the claimant's subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). To the extent the ALJ determines that the claimant's statements are not supported by the medical record, however, the ALJ's decision must include "specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence," and the reasons must be "clearly articulated" for a subsequent reviewer to assess how the adjudicator evaluated the individual's symptoms. SSR 16-3p. The factors that an ALJ should consider in evaluating the claimant's subjective complaints, where they are not supported by objective medical evidence alone, are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); *id.* §§ 416.929(c)(3)(i)-(vii).

---

regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p (S.S.A. Mar. 28, 2016). Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." *Id.* Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p *with* SSR 16-3p. As the ALJ's decision in this matter was issued after the new regulation went into effect, the Court will review the ALJ's evaluation of Plaintiff's statements regarding the intensity of her symptoms under the later regulation, SSR 16-3p.

### E.  __The Treating Physician Rule__

Under the so-called "treating physician rule,"[21] the medical opinion of a treating source

as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight,"

where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence in [the] case record."

20 C.F.R. §§ 404.927(c)(2), 416.927(c)(2).  "Treating source" is defined as the claimant's "own

physician, psychologist, or other acceptable medical source who . . . has provided [the claimant]

with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with

him or her.  20 C.F.R. §§ 404.902, 416.902.  Treating physicians' opinions are generally

accorded deference because treating physicians "are likely to be the medical professionals most

able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R.

§§ 404.927(c)(2), 416.927(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004)

(summary order).

Where an ALJ determines that a treating physician's opinion is not entitled to

"controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.

20 C.F.R. §§ 404.927(c)(2), 416.927(c)(2).  Failure to "give good reasons" is grounds for

remand.  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand

when the Commissioner has not provided 'good reasons' for the weight given to a treating

physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of

---

[21] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)[22]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R. §§ 404.927(c)(2)-5, 416.927(c)(2)-(5); *see Shaw*, 221 F.3d at 134 (noting that these five factors "must be considered when the treating  physician's opinion is not given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources.  20 C.F.R. §§ 404.927(c)(2), 416.927(c)(2); *see* SSR 96-2p (S.S.A. July 2, 1996) ("In many cases, a  treating source's medical opinion will be entitled to the greatest weight and should be adopted,  even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (Summary Order) (internal quotation marks and citation omitted).  This is because consultative examinations "are often brief, are generally performed without benefit or review of the  claimant's medical history, and, at best, only give a glimpse of the claimant on a single day."  *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citations omitted).  The opinions of consultative physicians, though, "can constitute

---

[22] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527 and 416.927, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

substantial evidence in support of the ALJ's decision" when the opinion of a claimant's treating

physician cannot be obtained.  *Sanchez v. Commissioner of Social Sec.*, No. 15cv4914, 2016

WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted by* 2017

WL 979056 (Mar. 13, 2017).

## II.   THE ALJ'S DECISION

On November 16, 2018, ALJ McCormack issued his written decision, finding that

Plaintiff was not under a disability for purposes of the Act and did not qualify for SSDI and SSI

benefits.  (R. at 10-22.)  In rendering this decision, the ALJ applied the required five-step

sequential evaluation.  (*See id.*)

### A.   Steps One Through Three of the Sequential Evaluation

At Step One, the ALJ determined that Plaintiff had met the "insured status" requirements

of the Act through to September 30, 2016, and that she had not engaged in substantial gainful

activity since March 17, 2015, the onset date of her alleged disability.  (*Id.* at 12.)

At Step Two, the ALJ found Plaintiff to have the severe impairments of fibromyalgia,

degenerative disc disease of the lumbosacral spine, cervical disc protrusions, migraine

headaches, asthma, and obstructive sleep apnea.  (*Id.* at 13 (citing 20 C.F.R. §§ 404.1520(c),

416.920(c)).)  As relevant here, the ALJ also stated:

> [Plaintiff] has had complaints of depression, panic disorder[,] and
> insomnia[,] but with regard to the severity of the mental
> impairments, the [ALJ] makes the following finding:  in
> understanding, remembering[,] or applying information;
> interacting with others; ability to concentrate, persist[,] and
> maintain pace; and ability to adapt or manage oneself, [Plaintiff]
> has no limitations.  Consequently, a finding that [Plaintiff] has a
> mental impairment that causes more than a minimal effect upon
> work ability (and hence is 'severe' for purposes of [the Act] and
> Regulations) is unwarranted.

(*Id.* at 13-14.)

At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that "me[t] or medically equal[ed] the severity" of a medical listing. (*Id*.)

### B.   The ALJ's Assessment of Plaintiff's RFC

Next, the ALJ determined that Plaintiff had the RFC to perform "sedentary work"[23] as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), with the following limitations:

> [Plaintiff] cannot crouch.  She can climb, stoop, kneel, and crawl on an occasional basis.  She can push[/]pull on a frequent basis.  She cannot work at jobs containing concentrated exposure to airborne irritants such as fumes, odors, dusts, gases, and/or smoke.  She cannot work at jobs requiring more than frequent exposure to extreme cold, humidity, or wetness.  She cannot work at jobs requiring more than occasional exposure to vibrations.  She cannot work at jobs requiring more than frequent operation of motor vehicles.  She cannot work at jobs containing more than occasional exposure to excessive noise, defined [as] noise not found in an office environment.

(*Id*. at 15.)  In making this RFC determination, the ALJ found, as a general matter, that Plaintiff had medically determinable impairments that "could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence[,] and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the [R]ecord" and, ultimately, with the RFC assessment the ALJ had developed based on that evidence.  (*Id*. at 20.)

---

[23] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a); 416.967(a).

Of note, the ALJ explained that, Plaintiff's "testimony about her signs, symptoms[,] and limitations [were] not well-supported by clinical or diagnostic findings and her characterization of pain and symptoms [was] not consistent with her treatment records." (*Id.*) Further, the ALJ stated that Plaintiff's "headaches [were] described as under excellent control," there was "no medical opinion [that] state[d] unequivocally that [Plaintiff was] unable to work in any capacity," and the medical record "d[id] not show any significant side-effects of medications." (*Id.*) Although the ALJ acknowledged that Plaintiff had "testified about anxiety and other mental health issues," the ALJ nonetheless found that Plaintiff had "no history of psychiatric hospitalization, [that she was] not taking any psychotropic medications, and [that she] had normal mental status findings upon [examination]." (*Id.*) Thus, the ALJ determined that, contrary to Plaintiff's position, the clinical evidence reflected that she "retained the [RFC] to perform the exertional demands of sedentary work, with the additional limitations" that the ALJ had described. (*Id.* at 15-16.)

Turning to the medical opinion evidence, the ALJ first considered the July 2018 consultative examination report of Dr. Dinovitser, who found Plaintiff to have some exertional limitations – particularly marked limitations in bending, lifting, and carrying; mild limitations in sitting; and moderate limitations in standing, walking, and climbing. (*Id.* at 17.) The ALJ gave "[s]ignificant weight" to this assessment, stating that Dr. Dinovitser's opinion as to Plaintiff's limitations was "factored into the [RFC,] because it [was] based on a complete physical examination and [was] consistent with other medical evidence of record." (*Id.* at 18.)

Next, the ALJ turned to the July 2018 report provided by Dr. Antar, Plaintiff's rheumatologist, who opined therein that Plaintiff had, *inter alia*, (1) fibromyalgia with symptoms that constantly interfered with attention and concentration required to perform simple work-

related tasks; (2) an inability to sit and stand/walk no more than one hour each in an eight-hour workday; (3) an inability to walk any distance without pain; and (4) the need to "take frequent breaks." (*Id.*)  Dr. Antar also opined that Plaintiff would likely miss three or four days of work per month because of her impairments. (*See id.*)  The ALJ stated that he was affording "[l]ittle weight" to Dr. Antar's opinions because, based on the ALJ's review of Dr. Antar's treatment records, those records "show[ed] that, while lumbar tenderness was noted, his examinations of [Plaintiff] were otherwise normal and that [Plaintiff] had normal motor strength bilaterally and a normal gait throughout." (*Id.*)  Thus, according to the ALJ, Dr. Antar's "opinions as expressed [in his report] [were] inconsistent" with his clinical findings. (*Id.*)

The ALJ also considered the July 2016 report of PA Waxman, who had opined, at that time, that Plaintiff was not capable of working an eight-hour workday, five days a week on a sustained basis and would likely be absent from work at least four times a month due to her impairments. (*See id.*)  PA Waxman had also opined that, *inter alia*, Plaintiff was only able to sit 10 or 15 minutes at a time for no more than one or two hours in an eight-hour workday and would need to take frequent breaks. (*See id.*)  The ALJ, upon reviewing these opinions, found that they were entitled to "[l]ittle weight" because, once again, the provider's stated opinions were "inconsistent with his own clinical findings"; specifically, the ALJ found that PA Waxman's treatment records showed that all of his "examinations of [Plaintiff] were negative for any abnormalities." (*Id.*)

Lastly, the ALJ reviewed the July 2018 report of PA Garigliano. (*Id.* at 18-19.)  In that report, PA Garigliano opined that Plaintiff was not capable of working an eight-hour workday five days a week on a sustained basis and would likely be absent from work more than four times a month due to her impairments. (*See id.*)  She also opined, *inter alia*, that Plaintiff's

impairments constantly interfered with the attention and concentration required to perform
simple tasks; that she could not walk any distance without pain; that she would need to take
unscheduled breaks; and that she was only able to sit and stand/walk for two hours in an eight-
hour workday. (*Id.* at 19.)  The ALJ wrote that he was affording "[l]ittle weight" to this opinion
because, according to the ALJ, PA Garigliano's treatment records showed that Plaintiff had
"normal physical examinations" on five dates in 2018 and 2017. (*Id.*)  In other words, the ALJ
applied the same type of reasoning as he had used to discount the opinions of Dr. Antar and PA
Waxman – finding that PA Garigliano's opinions regarding Plaintiff's functional limitations
were not entitled to be weighed heavily because, in the ALJ's view, they were inadequately
supported by the provider's own clinical records. (*See id.*)

### C.   Steps Four and Five of the Sequential Evaluation

At Step Four, the ALJ found that Plaintiff was unable to perform any of her past relevant
work. (*Id.* at 21.)  At Step Five, though, the ALJ found that Plaintiff was able to perform "jobs
that exist[ed] in significant numbers in the national economy" during the relevant period. (*Id.*)
In making this determination, the ALJ considered Plaintiff's age, education, work experience,
and RFC, noting specifically that Plaintiff was a younger individual,[24] and that transferability of
job skills was "not material to the determination of disability because using the Medical-
Vocational Rules as a framework directly support[ed] a finding that [Plaintiff was] 'not
disabled,' whether or not [she] ha[d] transferable job skills." (*Id.*)

---

[24] As set out above, Plaintiff was 41 years old at the alleged disability onset date, making
her a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c), which defines such a person
as being under 50 years of age. (*Id.*)  Under those regulations, the Commissioner considers that
the ability of those who are younger than 50 years to adjust to other work is not seriously limited.
(*See id.*)

The ALJ noted that, if Plaintiff had been determined to have the RFC to perform the full range of sedentary work, the Grids would have directed a finding that she was not disabled.  (*Id*.) As, however, the ALJ found Plaintiff's ability to perform all or substantially all of the requirements of that level of work to be "impeded by additional limitations," the ALJ relied on the testimony of the VE to determine whether jobs existed in the national economy that Plaintiff could perform.  (*Id.* at 21-22.)  Based on the ALJ's RFC determination and the VE's testimony at the Hearing, the ALJ concluded that Plaintiff had not been under a disability, as defined under the Act, from March 17, 2015 (the alleged onset date of her disability) through November 16, 2018 (the date of the decision).  (*Id.* at 22.)

## III.   <u>REVIEW OF THE ALJ'S DECISION</u>

As the ALJ used the applicable five-step evaluation in analyzing Plaintiff's disability claims, the initial question before the Court is whether, in proceeding under this accepted protocol, the ALJ made any errors of law that might have affected the disposition of Plaintiff's claims.  If the ALJ did not commit legal error, then the Court must go on to determine whether the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence.

Upon review, the Court finds that the ALJ did commit errors of law that might have affected the outcome of Plaintiff's benefit claims.  First, the Court agrees with Plaintiff that, with respect to Plaintiff's mental health conditions, the ALJ failed to take adequate steps to develop the Record before issuing his written decision.  More specifically, it was the ALJ's duty either to obtain a qualified treater's functional assessment of any work-related limitations resulting from the mental impairments that were documented in Plaintiff's medical records, or, if that was not possible, to request such an assessment from a consultative mental health professional, before determining – without the benefit of any expert opinion on the subject – whether Plaintiff's

mental impairments were "severe" or not; whether she had particular functional limitations

arising out any mental health conditions; and how any such limitations (in any form or severity

level) might impact her RFC.  Second, as argued by Plaintiff, the ALJ violated the treating

physician rule, by discounting the opinion of Plaintiff's treater, Dr. Antar, without providing

"good reasons" for doing so.  Because these errors cannot be said to have been harmless, this

matter must be remanded for further administrative proceedings.

### A.    The ALJ's Failure To Develop the Record

As the parties concede (*see* Pl. Mem., at 16; Def. Mem., at 20), and as set out above, an

ALJ has an affirmative duty to develop the record, even where the plaintiff is counseled, and

failure to do so is grounds for remand.  *See Rosa*, 168 F.3d at 79-82.  This duty extends to a

provider's medical opinion, as well a plaintiff's treatment records.  *Hooper v. Colvin,* 199

F. Supp. 3d 796, 812 (S.D.N.Y. 2016).

Here, there was an obvious gap in the medical record that was before the ALJ, a gap that

appears to have been material to his decision:  Despite the fact that the Record contained a series

of treatment notes relating to Plaintiff's anxiety and depressive symptoms, which were

complicated or potentially induced by her diagnoses of fibromyalgia and pain-related spinal

issues (*see, e.g.,* R. at 372-73, 439, 469, 500, 552, 595, 611-13), the Record did not contain a

functional assessment of her mental impairments from any mental health professional whom

Plaintiff had seen for her symptoms (such as Dr. Krieg, the psychiatrist at Crystal Run, whom

Plaintiff saw in June and July of 2018) or from any consultative psychiatrist or psychologist.

Indeed, as Plaintiff notes in her motion (*see* Pl. Mem., at 16-17), the ALJ declined to obtain an

opinion from any mental-health treatment provider or to order a psychological consultative

examination.  Instead, the SSA's single consultative examiner, Dr. Jay Dinovitser, an internal

medicine specialist, seemingly examined Plaintiff without reference to her mental health and
then provided a report that focused entirely on her exertional impairments, expressing no
opinions on any mental limitations that Plaintiff may have had.  (*See* R. at 652-57.)

Upon its review of the Record, the Court notes that the clinical records included therein
repeatedly suggest that, during the relevant period, Plaintiff suffered from mental impairments
that could have impacted her functional capacities.  More particularly, as early as July 2015,
Dr. Garfield's assessment of Plaintiff included that she suffered from "[f]atigue due to
fibromyalgia and anxiety."  (*Id*. at 595.)  In March 2016, PA Waxman observed Plaintiff to have
an "abnormal" mood and affect, and further noted that she had a PHQ-9 score of 24, indicating
major depressive disorder.  (*Id.* at 372-73.)  In February 2017, PA Waxman also noted that
Plaintiff had been referred for a psychiatry consultation.  (*Id.* at 552.)  Then, in July 2017,
Dr. Kaznatcheeva prescribed Valium for Plaintiff to address episodes of ocular myokymia,
which Plaintiff had reported would suddenly cause her to lose vision in the affected eye, and
which the doctor found was triggered by stress.  (*Id.* at 500; *see also id*. at 483 (reaffirming in
October 2017 that Plaintiff's symptoms were triggered by "stress and anxiety"); *supra* at n.14
(noting that Valium may be prescribed to treat anxiety, as well as muscle spasms).)

Further, while PA Garigliano – in her first appointment with Plaintiff on February 6,
2018 – indicated that Plaintiff's anxiety was controlled with Valium (*id.* at 469), by April 24,
2018, her notes reflected that Plaintiff had a "sense of impending doom" and symptoms that were
potentially caused by "extreme anxiety" (*id.* at 442).  Specifically, as reported by Plaintiff and
recorded by PA Gargliano:

> [Plaintiff] is presenting today complaining of two episodes of this
> strange feeling.  She states that about three months ago, she was
> sitting and talking to a friend . . . and she felt 'weir[]d.]  She had
> this 'feeling coming over me where I felt uncomfortable.'  She

> states that she thought maybe it was secondary to anxiety.  She
> states that all of a sudden she cannot follow the conversation and
> she will feel very diaphoretic.  She will get sweat on the upper lip
> as well as the forehead.  She will start to feel nauseous . . . .  She
> went to go leave the house and from her waist down went
> completely paralyzed.  . . .  Her fiancé had to help her to the car
> and she felt very weak.  She thought she was going to pass out.
> She had this overwhelming feeling that she was going to die.  She
> felt like her breathing was very shallow. . . . [T]he whole episode
> lasted for about an hour and a half . . . .  A couple of days ago, she
> was at her brother-in-law's house and the same situation happened
> again[.]  . . .  She is very upset in the office.

(*Id*. at 439.)

Two days later, on April 26, 2018, Dr. Lipelis recorded Plaintiff's description of these episodes as including hyperventilation and sudden weakness with fearful feeling, and also noted that Plaintiff had chronic generalized anxiety.  (*Id*. at 611.)  Dr. Lipelis advised Plaintiff, at that time, to seek mental health treatment.  (*Id*. at 613.)  Then, in May 2018, Dr. Kaznatcheeva suggested that Plaintiff's episodes were likely a vasovagal reaction (*see id.* at 433-34), a reaction which, as noted above, can be caused by "extreme emotional distress" (*see supra*, at n.16), and, in June 2018, upon being seen by Dr. Krieg, Plaintiff reported recent feelings of hopelessness, insomnia, loss of interest, guilty ruminations, and frequent mood swings (*id*. at 603).  Dr. Krieg, in turn, prescribed the psychiatric medication Sertraline (*see supra*, at n.17), and scheduled Plaintiff for psychotherapy (*id*. at 609), although the Record does not contain psychotherapy records.  Later that same month, Plaintiff told PA Garigliano that she was continuing to experience "strange feeling[s]," although her episodes were not as bad as those that had caused her paralysis (*id*. at 680); Plaintiff did state, however, that she had panic attacks when she was not in the house, and she still had some eye twitching (*id.*) (which had been diagnosed by Dr. Kaznatcheeva as anxiety-related myokymia).

In July 2018, Dr. Krieg noted that Plaintiff reported that she had *not* experienced any significant improvement in her depressive/anxiety symptoms with medication, and that she continued to experience moderate depressive symptoms with loss of interest, mood swings, occasional spikes in anxiety, and insomnia.  (*Id.* at 695.)  At that time, on examination, Plaintiff's mood was found to be anxious and depressed.  (*Id.* at 697.)  Ultimately, Dr. Krieg assessed Plaintiff as having an adjustment disorder related to chronic medical comorbidities.  (*Id.* at 698.)

Even the limited medical opinion evidence in the Record from Plaintiff's non-psychiatric healthcare providers were suggestive of mental limitations.  In this regard, Dr. Antar, Plaintiff's treating physician, opined that symptoms associated with Plaintiff's physical impairments (such as her fibromyalgia) were severe enough to interfere with her attention and concentration and required her to perform simple work-related tasks.  (*Id.* at 666-68.)  Likewise, PA Garigliano, who had repeatedly examined Plaintiff during the relevant period, opined that Plaintiff's symptoms – including anxiety – that were associated with her various impairments were severe enough to interfere with the attention and concentration required to perform simple work-related tasks.  (*Id.* at 685-87.)

Based on all of this medical evidence in the Record, the ALJ should have sought a functional assessment from a mental health treater or a consultative mental health professional, before undertaking to determine whether Plaintiff had a "severe" mental health impairment as defined by the relevant regulations, and, even if not, whether Plaintiff had specific non-exertional limitations, related to her mental health conditions, that may have materially impacted her ability to work.  The ALJ, however, apparently made no such effort.  While the ALJ expressly recognized that Plaintiff had "had complaints of depression[ and]panic disorder" (*id*. at 13), the Record does not reflect that he ever, for example, asked Dr. Krieg – the psychiatrist who had

examined Plaintiff and prescribed her psychiatric medication – to provide a functional assessment; certainly, the Record does not suggest that Dr. Krieg ever refused to provide such an assessment.

The applicable regulations make clear that the burden did not rest solely on Plaintiff's counsel to develop the Record in this case.  Rather, as courts in this Circuit have consistently held, when an ALJ is tasked with determining a claimant's RFC, the ALJ's failure to request a completed functional assessment from a provider constitutes a failure of her duty to develop the record and should result in remand.  *See, e.g., Romero v. Comm'r of Soc. Sec.*, No. 18cv10248 (KHP), 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020) (collecting cases); *see Brooks v. Kijakazi*, No. 20cv7750 (GBD) (JLC), 2022 WL 213994, at *17 (S.D.N.Y. Jan. 25, 2022) (lack of a functional assessment from a source familiar with the claimant's impairments and covering the relevant period was an "obvious" gap in the record).  Moreover, if a treatment provider refuses to provide the necessary functional assessment, then it is the ALJ's responsibility to seek one from a consultant examiner.  *See Calvin E. v. Saul*, No. 5:18-CV-060 (CFH), 2019 WL 2869681, at *7 (N.D.N.Y. July 3, 2019) (noting that it is "reversible error for the ALJ to fail to obtain a consultative examination if such an evaluation is necessary for the ALJ to make an informed decision" (internal quotation marks and citation omitted)); *see also, e.g., Del Carmen Rojas v. Berryhill*, No. 17cv6788 (BD) (DF), 2019 WL 2453342, at *19 (S.D.N.Y. Jan. 30, 2019) (in light of plaintiff's testimony regarding the debilitating effects of her uncontrolled diabetes, the ALJ should have sought a medical source statement, specifically including a functional assessment, "from a treater," or, if a treater could not produce such an assessment, from an "examining consultant"), *report and recommendation adopted*, 368 F. Supp. 3d 668 (Mar. 15, 2019).

Ultimately, without a functional assessment of Plaintiff's mental limitations, from either

a treater or consultative examiner with mental health expertise, the ALJ was forced to make

unsupported assumptions about Plaintiff's non-exertional limitations, in order to formulate her

RFC.  In so doing, he impermissibly substituted his own lay opinion for that of a medical

professional.  *See Manzella v. Comm'r of Soc. Sec.*, No. 20cv3765 (VEC) (SLC), 2021 WL

5910648, at *14 (S.D.N.Y. Oct. 27, 2021) ("ALJs may not, of course 'play doctor' by using their

own lay opinions to fill evidentiary gaps in the record."), *report and recommendation adopted*,

2021 WL 5493186 (Nov. 22, 2021).

The ALJ's failure to develop the Record regarding Plaintiff's mental limitations before

determining her RFC was error.  Further, this error cannot be considered to have been harmless,

as, absent a complete record regarding Plaintiff's mental impairments, the ALJ could not have

properly formulated Plaintiff's RFC.  Remand is therefore required, and, on remand, the ALJ is

directed to take appropriate steps to develop the Record by seeking a functional assessment

regarding Plaintiff's mental limitations from a psychiatric treater or, if necessary, a consulting

mental health professional.

### B. <u>The ALJ's Failure To Give Proper Weight to the Medical Opinion Evidence</u>

In addition, as Plaintiff also points out (*see* Pl. Mem., at 19-21), the ALJ erred by failing

to weigh the medical opinion evidence in a manner consistent with the applicable regulations and

precedent.  More particularly, the ALJ erred by failing to adhere to the treating physician rule

with respect to his evaluation of the opinion of Plaintiff's treating rheumatologist, Dr. Antar,[25]

---

[25] Dr. Antar is the only one of Plaintiff's treaters who provided opinion evidence and qualifies as a "treating source" under the treating physician rule, such that his opinion should have been afforded "controlling weight," absent good reasons for discounting it.  PAs Waxman and Garigliano, as physician's assistants, only qualified as "other medical sources" under the pertinent regulations, *see* 20 C.F.R. §§ 416.913(d)(1), 404.1513(d)(1), and the regulations

particularly with respect to his opinions as to Plaintiff's limitations in sitting and standing, her

need for frequent breaks throughout the day, and her need for at least three or four absences from

work per month. Despite Plaintiff's longstanding treatment relationship with Dr. Antar, the ALJ

afforded only "little weight" to Dr. Antar's opinion. (*See* R. at 18.)

As set out above (*see* Discussion, *supra*, at Section I(E)), under the treating physician

rule, an ALJ is required to give controlling weight to a treating physician's opinion, or else give

"good reasons" for the weight that is given, 20 C.F.R. § 416.927(c)(2); *see Ross v. Colvin*,

No. 6:16-CV-06618 (MAT), 2018 WL 947267, at *5 (W.D.N.Y. Feb. 20, 2018) ("A corollary to

the treating physician rule is the so-called 'good reasons rule,' which provides that the SSA 'will

give good reasons in [its] notice of determination or decision for the weight [it] gives

[claimant's] treating source's opinion."). Failure to "give good reasons" is grounds for remand.

*Halloran*, 362 F.3d at 33.

Here, the supposed "good reason" that the ALJ gave for discounting Dr. Antar's opinion

was that, while Dr. Antar's treating records had noted "lumbar tenderness," his "examinations of

[Plaintiff] were otherwise normal and [reflected] that [Plaintiff] had normal motor strength

bilaterally and a normal gait throughout." (R. at 18.) According to the ALJ, these clinical

findings were inconsistent with Dr. Antar's opinions as to Plaintiff's functional limitations in a

work setting, requiring his opinions to be discounted. (*See id.*) In light of the medical records as

a whole, however, this explanation was not sufficient to "fulfill [the ALJ's] obligation under the

---

directed the ALJ to use various factors in evaluating their opinions, including frequency of
treatment, consistency with other evidence, degree of supporting evidence, thoroughness of
explanation, and whether those sources had areas of expertise, *see id.*; *see also Julia A. v.
Comm'r of Soc. Sec.*, No. 8:20-CV-1237 (ATB), 2022 WL 813901, at *9 (N.D.N.Y. Mar. 17,
2022).

treating physician rule." *Crutch v. Colvin*, No. 14-CV-3201 (SLT), 2017 WL 3086606, at *8 (E.D.N.Y. July 19, 2017).

First, although the ALJ was correct that certain of Dr. Antar's examinations of Plaintiff, during the relevant period, had revealed "normal" motor strength and "normal" gait, the ALJ failed to address the series of treatment records and clinical notes in the Record that documented Plaintiff's persistent reports of pain (not only in her lower back, but also in her other extremities and head), her cervical disc abnormalities (as recorded in MRIs), her positive straight leg tests, and her observable limited range of motion. (*See, e.g.*, R. at 412, 480-81, 538-39, 936-37). Indeed, the ALJ's cursory consideration of Dr. Antar's clinical findings appears to have been an over-simplification or purposeful cherry-picking of even Dr. Antar's own clinical records, which variously include notations not only of lumbar tenderness, but also of tenderness in Plaintiff's elbows, wrists, knees and ankles, tender range of motion in her hip, localized erythema, and ecchymosis in her spine. (*See id.* at 444-45, 515-17, 538-39.)

Second, Plaintiff's had a well-documented fibromyalgia diagnosis, and the condition of fibromyalgia is understood to cause potentially disabling symptoms, even where specific abnormalities may not be found upon clinical examination of a patient's gait, for example, or in tests of her motor strength, or even in imaging studies. *See Baker v. Berryhill*, No. 17cv8433 (AT) (DF), 2019 WL 1062110, at *32 (S.D.N.Y. Feb. 19, 2019) (noting that, "as the symptoms of fibromyalgia are often not demonstrated through 'objective' medical findings," the ALJ must, "in the context of [p]laintiff's fibromyalgia diagnosis, ascribe increased significance to [p]laintiff's subjective complaints of symptoms, and not rely solely upon findings from physical examination results or diagnostic studies"), *report and recommendation adopted*, 2019 WL 1059997 (Mar. 6, 2019); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)

(recognizing "that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease" (internal quotation marks and citations omitted); *see also, e.g., Campbell v. Colvin*, No. 5:13-cv-451 (GLS/ESH), 2015 WL 73763, at *11-12 (N.D.N.Y. Jan. 6, 2015) (holding that ALJ erred when looking only to objective evidence for rejecting medical source opinion relating to fibromyalgia); *Casselbury v. Colvin*, 90 F. Supp. 3d 81, 94 (W.D.N.Y. 2015) (holding that, where the ALJ did not consider the potential functional limitations as a result of fibromyalgia symptoms, remand was warranted).

It is well settled that an ALJ's "good reason" for discrediting a treating physician's opinion cannot rest on mischaracterized or "cherry-picked" evidence. *See Quinto v. Berryhill*, No. 3:17-cv-00024 (JCH), 2017 WL 6017931, at *14 (D. Conn. Dec. 1, 2017); *see also Vasquez v. Comm'r of Soc. Sec.*, No. 14cv6900 (JCF), 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) (an ALJ may not pick and choose evidence that supports her conclusions).  In addition, based on the authority cited above, the lack of objective clinical findings cannot, in itself, constitute a "good reason" for rejecting a treating physician's opinion as to limitations caused by fibromyalgia.  Thus, in line with applicable precedent, the Court finds that the explanation offered by the ALJ to discount Dr. Antar's series of opinions about Plaintiff's limitations was inadequate.  *See Halloran*, 362 F.3d at 33.

The Court also notes that the ALJ's failure to comply with the treating physician rule was plainly not harmless error, given that, had the ALJ given greater weight to Dr. Antar's stated opinions – particularly his opinions regarding Plaintiff's ability to sit and stand, her need for breaks during the workday, and her likely absences from work – this may well have affected both the ALJ's formulation of Plaintiff's RFC and the ultimate disability determination.  Indeed, the VE testified at the Hearing that there would be no jobs available in the national economy for

an individual who would need to take "at least three absences from work each month" (R. at 75), which, according to Dr. Antar, would have been necessary for Plaintiff.

Remand is therefore also required for this error.  On remand, the ALJ is directed to reconsider the weight that should be assigned to the medical opinion of Dr. Antar, under the treating physician rule.  If, on remand, the ALJ again determines that Dr. Antar's opinion should be discounted, then the ALJ is directed to set forth good reasons for assigning less than controlling weight to Dr. Antar's particular assessment of Plaintiff's ability to sit and stand, and of her need for work breaks and to take absences from work.

If, based on a fully developed record regarding Plaintiff's mental impairments and/or a reweighing of Dr. Antar's opinion, the ALJ alters his initial view of Plaintiff's RFC, then the ALJ is further directed, as necessary, to recall the VE for additional testimony, to aid in the ALJ's determination of whether Plaintiff's reassessed RFC would preclude employment for Plaintiff during the relevant periods.

As the Court has found that this case must be remanded for both of the reasons discussed above, it need not fully address Plaintiff's third contention that the ALJ also failed to conduct a proper evaluation of Plaintiff's subjective complaints.  (*See* Pl. Mem., at 21-23.).  Nonetheless, the Court notes that, on remand, the ALJ should, in accordance with the factors laid out in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); *id.* §§ 416.929(c)(3)(i)-(vii), give due consideration to both Plaintiff's consistent complaints of pain related to her fibromyalgia diagnosis and her complaints of mental limitations.  *See Soto v. Barnhart*, 242 F. Supp. 2d 251, 255-56 (W.D.N.Y. 2003) ("When fibromyalgia is alleged, the credibility of a claimant's testimony regarding her symptoms must take on substantially increased significance in the ALJ's evaluation of the evidence.

Because of the lack of clinical tests to identify this affliction, the subjective opinions of plaintiff

are helpful when determining issues of severity.").

## **CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion for judgment on the pleadings

(Dkt. 16) is granted to the extent it seeks remand to the SSA for further proceedings, and

Defendant's cross-motion for judgment on the pleadings (Dkt. 18) is denied.  Upon remand, the

ALJ is directed

(1)   To develop the Record by obtaining a functional assessment of Plaintiff's mental impairments from a treating psychiatrist, or, if necessary, a consulting mental health professional;

(2)   To reweigh the medical opinion of Plaintiff's treating physician, Dr. Antar, in accordance with the treating physician rule, particularly as that opinion relates to Plaintiff's sit/stand ability, her need for frequent breaks, and her need for a certain number of absences from work per month, and to give "good reasons" for discounting any aspect of that opinion; and

(3)   To reassess Plaintiff's RFC in light of (1) and (2) above, and after giving due consideration to Plaintiff's subjective complaints of pain and of mental limitations, and to recall the VE, if necessary, to make the disability determination based on the reassessed RFC.

Dated:  New York, New York
          March 31, 2022

SO ORDERED

_____
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

All counsel (via ECF)

54